IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMY EVANS, | ) | Case No. 1:19 CV 2895 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.        Introduction

Plaintiff, Amy Evans, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 11.  Evans is not entitled to a Sentence Six remand because she has not shown that the additional evidence she submitted is new and/or material to her application.  Because the administrative law judge ("ALJ") properly evaluated the medical opinion evidence and did not err in determining Evans's RFC, and because Evans has not identified any incorrect application of legal standards, the ALJ's decision must be AFFIRMED.

## II.      Procedural History

Evans applied for DIB on January 4, 2016.  (Tr. 562).[1]  She alleged a disability onset of August 2, 2015 due to migraines, degenerative disc disease, herniated disc, arthritic knees and carpal tunnel.  (Tr. 562, 589).  The Social Security Administration denied Evans's claim initially and upon reconsideration.  (Tr. 531-534. 538-541).  Evans requested an administrative hearing.  (Tr. 545).  ALJ Scott Canfield heard Evans's case on September 12, 2017 and denied her claim in an October 2, 2018 decision.  (Tr. 8-27).  The Appeals Council declined further review on October 16, 2019, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On December 14, 2019, Evans filed a complaint to obtain judicial review.  ECF Doc. 1.

## III.     Evidence

### A.      Relevant Medical Evidence

An MRI of Evans's cervical spine on February 14, 2013 showed a disc herniation at C5-C6.  (Tr. 872).  On September 18, 2015, Evans saw Dr. Susan H. Lackey, an internal medicine doctor at Cleveland Clinic Main Campus.  Evans complained that neck pain was worsening due to carrying her new baby.  She also complained of chronic knee pain which was dull but constant.  Evans reported difficulty going up and down stairs.  (Tr. 710).  Physical examination showed that Evans's left knee was slightly larger than the right knee in the patella area.  Dr. Lackey diagnosed cervical radiculopathy, cervical degenerative disc disease and chondromalacia of the knee, unspecified laterally.  (Tr. 712).

An x-ray of Evans's right knee on October 1, 2015 showed mild narrowing of the medial tibiofemoral joint compartment, mild to moderate narrowing of the lateral patellofemoral joint compartment, and a small amount of periarticular spurring.  An x-ray of the left knee showed

---

[1] The administrative transcript appears in ECF Doc. 9.

mild narrowing of the medial tibiofemoral joint compartment, moderate narrowing of the lateral patellofemoral joint compartment, and small to moderate amount of periarticular spurring.  (Tr. 810).

Robert J. Nickodem, MD, an orthopedic doctor, examined Evans's knees on October 1, 2015.  Evans reported pain in both knees for twenty years, which had worsened over the last several years.  Physical examination showed range of motion of the knees from 0-125 degrees with crepitation in the patellofemoral compartments.  (Tr. 983).  Dr. Nickodem diagnosed primary osteoarthritis, ordered physical therapy and recommended that Evans use knee sleeves that she already had.  (Tr. 984).

Evans was evaluated for physical therapy for her knees on October 29, 2015.  She reported increased pain when standing and going up and down stairs.  She was limited in her ability to stand, walk, kneel and climb stairs.  (Tr. 668).  The therapist noted that Evans had bilateral knee pain due to patellofemoral dysfunction or imbalance, pronating feet, and a weak core.  (Tr. 669).  Evans continued physical therapy through December 2015.  (Tr. 759, 767, 770).

Evans saw Dr. Lackey again on December 11, 2015.  Evans complained of headaches with intermittent, sharp pains and right neck pain radiating up to the right side of her face. Physical examination showed trapezius trigger points, right side, discomfort with rotation to the left and flexion restrictions, and limited range of motion of the neck. Dr. Lackey stated that Evans had possible migraines with trigger points from the right neck and shoulder.  (Tr. 722). Dr. Lackey diagnosed tension headache and migraine without an aura and without status migrainosus, not intractable, and degenerative disc disease.  (Tr. 725).

On December 16, 2015, Evans saw Dr. Dina Stock for bilateral feet and knee pain.  (Tr. 761).  Physical examination showed positive Tinel's sign on left foot to dorsal cutaneous nerve

3

on left and sural on the left, discomfort with dorsiflexion/eversion bilaterally against resistance, and discomfort along the fascia from distal calcaneal level bilateral to the distal arches.  Dr. Stock diagnosed peroneal bilateral tendinitis, neuritis intermediate dorsal cutaneous nerve and sural left-local compression versus proximal etiology not ruled out and bilateral plantar fasciitis. (Tr. 762).

On January 7, 2016, Evans followed-up with Dr. Lackey and stated that her migraines were being triggered from trapezius pain.  The pain was moderate and unilateral on the right.  The migraines were associated with photophobia, phonophobia and neck stiffness.  (Tr. 731).  Possible triggers for Evans's headaches included odors and stress.  The headaches lasted for hours and occurred a few times a week.  Evans rested in a quiet room and used cool compresses for partial relief.  Dr. Lackey diagnosed migraine without aura and with status migrainosus, not intractable.  (Tr. 734).

On January 13, 2016, Evans underwent a physical therapy evaluation by Yelana Brant, PT.  Evans reported that her neck pain was worse with lifting and better with lying, rest and ice, and that her sleep was affected by pain.  (Tr. 661).  Physical examination showed minimal limitation in cervical range of motion; bilateral strength of the shoulder was 4-/5 and scapular stabilizers were 4/5; she had tenderness of the right sided upper, middle trapezius and right sided rhomboids.  Physical therapy was recommended to improve pain, increase range of motion, postural training for optimal head, neck and shoulder alignment, increase strength of both shoulders and scapular stabilizers, and home exercise program instructions.  (Tr. 662).  Evans continued physical therapy through mid-March 2016.  (Tr. 653, 908, 913, 917, 922).  Evans was discharged from physical therapy on March 30, 2016.  She had achieved maximum benefit from

her therapy with full active range of motion of the cervical spine with some discomfort, and muscular endurance of the shoulder and scapular improved.  (Tr. 923-924).

Evans initiated treatment with Dr. Mark Rood at Cleveland Clinic South Russell Family Practice on January 21, 2016.  Evans reported mostly bifrontal throbbing headaches, but sometimes on the right side with sharp pain.  (Tr. 656).  They were accompanied with nausea and vomiting when the pain was severe.  Dr. Rood's examination showed limited range of motion to the left neck, which caused discomfort in the right neck and right hemicranium, clicking and limited jaw opening and closing at the temporomandibular joint, and a slight gait disturbance. (Tr. 657).  Dr. Rood diagnosed migraine, without an aura, and with status migrainosus, and muscle contraction headache syndrome and chronic jaw pain.  He advised Evans to consult with dentistry.  (Tr. 658).

Physical therapy for Evans's knees was discontinued on January 22, 2016 after her fifth visit due to achieving maximum physical therapy benefit.  Evans still experienced left greater than right knee pain with all of her activities and had difficulty with bending and squatting.  (Tr. 654-655).

On February 18, 2016, Evans followed-up with Dr. Rood.  She complained of constant head pain across the top of her head; she still had neck symptoms and was sensitive to light.  She reported intermittent nausea and vomiting and an increase in headaches.  (Tr. 1082).  Physical examination showed reduced jaw opening with clicking and tenderness at extremes of neck.  Dr. Rood assessed cervical pain, migraine without an aura and with status migrainosus not intractable, breast-feeding status of mother and chronic pain of both knees.  (Tr. 1083).

On May 23, 2016, Evans returned to see Dr. Nickodem for continued knee pain.  She described the pain as achy anterior pain in both knees, made worse by stairs.  (Tr. 990).  Physical

examination showed crepitation in the patellofemoral compartment of the left knee with range of motion from 0-125 degrees and crepitation in the patellofemoral compartment of the right knee with full range of motion.  Dr. Nickodem diagnosed bilateral primary osteoarthritis of the knees with chondromalacia in both knees.  (Tr. 991).

Evans saw Dr. Rood again on May 31, 2016.  She reported photophobia with migraines and light sensitivity.  Her migraines were associated with chronic neck pain and right parietal temporal area twice a week; jaw motion could also trigger a migraine.  Evans reported that her current headache was bifrontal.  (Tr. 1089).  Physical examination revealed tenderness of the head when the neck turned to the right and with full flexion.  Dr. Rood assessed cervical pain and migraine with aura with status migrainosus.  (Tr. 1090).

On July 23, 2016, Evans saw a neurologist, Dr. Harold Mars.  Evans reported daily headaches with migraines which occurred twice a week.  Physical examination showed tightness in the paraspinous musculature.  Evans was unable to take prescribed medications at the time because she was breast-feeding and was advised to take over-the-counter Excedrin Migraine.  (Tr. 1028).

Evans followed-up with Dr. Mars on October 26, 2016.  She complained of migraine headaches every other day.  (Tr. 1034).  Dr. Mars' examination revealed tightness in the cervical musculature.  He stated that he was going to obtain an ice/heat gel collar for Evans.  (Tr. 1035).

On December 5, 2016, Evans reported to Dr. Rood that she had experienced dizziness/lightheadedness, headaches, vision changes and occasional paresthesia in the right arm. Dr. Rood diagnosed perennial allergic rhinitis, chronic non-intractable headaches and breast-feeding status of the mother.  (Tr. 1096).

Evans saw Dr. Mars on February 27, 2017.  She continued to complain of migraine headaches occurring approximately every other day.  (Tr. 1066).  She had used ice packs to relieve the pain.  Her neurological examination was normal.  (Tr. 1067).  On June 26, 2017, Evans reported continuing headaches to Dr. Mars.  (Tr. 1103).

Evans consulted with Dr. Tom Abelson on July 7, 2017 for her migraines, headaches and jaw and neck pain.  Dr. Abelson's impression was that Evans had severe temporomandibular joint syndrome.  Evans reported that her jaw pain was worsening, as were her migraines.  Dr. Abelson stated that Evans's jaw pain may have been contributing to her migraines, but Evans did not think so.  (Tr. 1149).

Evans went to the emergency room on November 15, 2017 with complaints of double vision and a prior history of migraines.  (Tr. 1160).  CT scans of Evans's head and neck were unremarkable.  She was discharged with the diagnosis of non-intractable headache, unspecified chronicity pattern, unspecified headache type.  (Tr. 1163).

On December 26, 2017, Evans reported to Dr. Alla Kirsch that she was using Fioricet two to three times per week.  She continued to complain of right-sided neck pain which occurred with and without a migraine.  (Tr. 1191).  Dr. Kirsch diagnosed Cervicalgia and muscle contraction headache.  (Tr. 1192).

On January 26, 2018, Evans had a physical therapy evaluation for her right-sided cervical pain and headaches.  She had slight limited cervical range of motion, abnormal sitting posture, and decreased knowledge of home exercise program and postural principles.  (Tr. 1197).  Examination showed normal cervical range of motion, but movement increased pain.  (Tr. 1198).  Her cervical and upper extremity strength was 4+/5.  (Tr. 1199).  Physical therapy was

recommended.  Evans was discharged from physical therapy on her fifth visit on February 28, 2018 because she had reached maximum benefit from physical therapy.  (Tr. 1223).

**B.     Medical Evidence Submitted after the Hearing**

After the hearing, Evans submitted records from the Case Western Reserve University School of Dental Medicine from August 31, 2017 through March 29, 2018.  Evans reported clicking and painful temporomandibular joint with opening and closing, and constant headaches. Evans reported migraine headaches three to five times a week and being tender in the morning. (Tr. 436).  A splint was made for Evans and she was able to wear it for three hours with no issues except for some tightness on post.  (Tr. 416).

On December 24, 2018, Evans saw an oral surgeon for her jaw pain.  (Tr. 406).  Evans reported that chewing hard food and lying on her sides made the jaw pain worse.  Examination showed pain, temporomandibular joint tenderness and joint clicking on the left side.  (Tr. 408, 418, 432).  Evans's diagnosis was myofascial pain dysfunction syndrome.  (Tr. 409).  On January 17, 2019, she received a steroid injection in the masseters bilaterally and in the left tendon of temporalis.  (Tr. 358).

Evans saw Dr. Kirsch on January 8, 2019 for low back pain, pain over all her toes, right pelvic and thigh pain before menses, and headaches.  (Tr. 171).  Physical examination showed that Evans was tender in her chest lateral to upper coccyx on left; she had full range of motion; was negative for straight leg raise; and her left foot was very tender over her metatarso-phalangeal joints.  Dr. Kirsch assessed recurrent low back pain, menstrual pain, left foot pain, and migraine without an aura with status migrainosus, not intractable.  (Tr. 174).

Evans consulted with Dr. Cynthia Bamford on February 21, 2019.  Evans reported daily headaches with migraines 2-3 times per week, aggravated by lights, sounds and smells,

accompanied with, nausea, vomiting, vertigo, lightheadedness, weakness, numbness, blurred vision and neck pain, worse with movement, but relieved by lying down.  (Tr. 251). Examination showed suboccipital tenderness, pericervical and upper shoulder musculature/trapezius tenderness, and hyper tonicity.  (Tr. 253).  Dr. Bamford diagnosed chronic migraine and medication overuse headaches.  (Tr. 255).

      **C.**     **Relevant Opinion Evidence**

           **1.**       **Treating Physician Opinion – Dr. Harold Mars**

Dr. Harold Mars wrote a letter to Evans's attorney on July 6, 2017.  Dr. Mars stated that Evans had been having migraine headaches two to three times a week, lasting 8-12 hours; had been experiencing nausea (vomiting), light sensitivity, dizziness, jaw and neck pain.  Dr. Mars further stated that, "Ms. Evans states that she may miss 2-3 days a week from work due to the disabling headaches."  (Tr. 1106).

On August 22, 2017, Dr. Mars completed a medical source statement related to Evans's physical capacity.  (Tr. 1155-1156).  Dr. Mars stated that Evans was physically limited by cervical herniation, degenerative disc disease, carpal tunnel, migraine and cervical radiculopathy. Dr. Mars opined that Evans was limited to lifting 25 pounds occasionally and 10 pounds frequently; standing/walking was limited to four hours and two hours without interruption; sitting was unlimited.  (Tr. 1155).  Dr. Mars also stated that Evans could only rarely climb, balance, stoop, crouch, kneel, crawl, reach, push/pull and use fine/gross manipulation.  Dr. Mars opined that Evans's impairments were affected by heights, moving machinery, temperature extremes, pulmonary irritants and noise as these all could trigger migraines.  He noted that Evans used knee and neck braces.  Dr. Mars reported that Evans had severe pain which would interfere with concentration, take her off task and cause absenteeism.  Dr. Mars opined that Evans's

migraines would make a regular work schedule unpredictable and that her headaches and herniated disc would make a work-day impossible.  He opined that Evans would need to rest all day if she had a migraine.  (Tr. 1156).

### 2.    Treating Physician Opinion – Dr. Alla Kirsch

On August 14, 2017, Dr. Alla Kirsch completed a medical source statement regarding Evans's physical capacity.  (Tr. 1153-1154).  Dr. Kirsch stated that Evans's ability to work would be limited by her cervical pain, cervical radiculopathy, cervical herniated disc, right arm pain, carpal tunnel syndrome, and osteoarthritis of her knees.  Dr. Kirsch limited Evans to lifting and carrying 25 pounds occasionally and 10 pounds frequently; standing and walking to four total hours without interruption; and no limitation on sitting.  (Tr. 1153).  Evans was further limited to rarely climbing, balancing, stooping, crouching, kneeling, crawling, reaching and pushing/pulling.  Dr. Kirsch opined that Evans could occasionally perform fine and gross manipulation and was limited in her ability to work around heights, moving machinery, temperature extremes, pulmonary irritants, and noise.  Dr. Kirsch reported that Evans had severe pain that would interfere with concentration, take Evans off task and cause absenteeism.  Dr. Kirsch opined that Evans would need eight hours of breaks.  Dr. Kirsch reported that Evans had headaches with jaw pain every day and migraines two to three times a week along with neck pain that could last eight to twenty-four hours.  (Tr. 1154).

### 3.    State Agency Consultants

On May 22, 2016, state agency consultant, Dr. Ermias Seleshi, evaluated Evans's physical capacity based on a review of the medical record.  (Tr. 514-16).  Dr. Seleshi determined that Evans could lift up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for up to 6 hours in an 8-hour day, and sit for up to 6 hours in an 8-hour workday.  (Tr. 514).  Dr.

Seleshi also opined that Evans could never climb ladders ropes or scaffolds; could occasionally kneel, crouch and crawl; could frequently stoop; and could not work around unprotected heights or dangerous unshielded machinery.  (Tr. 515-516).  On February 5, 2016, Dr. William Bolz reviewed the medical record and concurred with Dr. Seleshi's opinion, except he found that Evans could frequently climb ladders, ropes and scaffolds.  (Tr. 524-526).

### 4.     Family Statements

Evans's mother, Ms. Nancy Todd, submitted a statement that Evans called her at least once or twice a week to come over to assist because of headache/migraine pain.  (Tr. 639).  Evans's mother-in-law, Kimberly Sulecki, submitted a similar statement.  (Tr. 640).

### D.     Relevant Testimonial Evidence

Evans testified at the hearing.  (Tr. 459-496, 503-504).  She was 5'2" and weighed 180 pounds.  (Tr. 479).  She had a high school and college education.  She had a driver's license and was able to drive.  (Tr. 460).  She lived in a split-level house with her husband and child.  (Tr. 495).

Evans had previously worked for several years as a graphic designer at Xerox.  (Tr. 462).  She then worked at OfficeMax doing various jobs such as graphic designing and printing work; she later worked there as a sales associate.  (Tr. 463-466).  Next, Evans worked as a sales associate at Office Depot.  (Tr. 466).  At all of these jobs, Evans was required to occasionally lift cases of paper weighing 30 to 40 pounds.  (Tr. 468).  She stopped working when she got pregnant.  (Tr. 467).

Evans started getting migraine headaches after a car accident in 2011.  (Tr. 481).  After her pregnancy, Evans's migraines (Tr. 481-482), nerve pain, radiculopathy, and knee arthritis increased.  When Evans had a migraine, she was nauseous, sensitive to the light, had to lie down

and could not function.  She had experienced migraines before her pregnancy, but not as often. At the time of the hearing, Evans was having migraines two to three times a week.  (Tr. 469). When Evans got a migraine, she would get ice, drink a lot of water and lie down.  If that didn't alleviate her symptoms, she would take medication.  (Tr. 469-470).  Her migraines would normally last eight hours but could last up to two days.  (Tr. 470-471).

Evans had had a herniated disc in her neck for some time.  Following her pregnancy, the pain from this condition worsened.  The pain was severe on the right side of her face and neck, and felt like someone was taking an electric charger to her head.  (Tr. 471).  Evans neck pain increased with lifting heavy objections, such as a gallon of milk, and lying in certain positions. (Tr. 475).  She also had pain from arthritis in her jaw and in both of her knees.  Evans had problems with stairs or going up hills, but she estimated that she could stand and walk for about three hours before needing to sit.  (Tr. 472-473).  She had no pain with sitting.  (Tr. 473).

When working, Evans had had some pain and finger contraction on her right hand due to carpal tunnel syndrome.  After she stopped working, she did not have as many problems because she did not use the computer as much.  (Tr. 473-474).  She rated the pain in her right hand as a 3/10 and said that she had more difficulty manipulating small things with it.  (Tr. 503).

Evans had completed courses of physical therapy and still did exercises every day from home.  She felt that they had helped with her neck and knees.  (Tr. 474).  She also took medication before bed for her neck pain.  When she didn't have any migraine or neck pain, she was able to sleep well.  (Tr. 475-476).  Evans had previously had an injection in her neck, but her doctor did not recommend that she continue receiving those.  He prescribed a neck brace.  Evans used ice packs on her neck and head to alleviate pain.  (Tr. 478).  She did not like using medication and used it sparingly.  (Tr. 485, 487-488).

Evans's mother and mother-in-law helped take care of her child.  Her husband helped with cooking, laundry and housekeeping.  She did some of the cooking and her own laundry.  (Tr. 476).  She also did some of the lighter housework.  She was able to shop, but usually asked her husband to come with her.  (Tr. 491).

Vocational expert, Millie Droste ("VE"), also testified.  (Tr. 494-505). [2]  She considered Evans's past work to be graphic designer and customer service clerk.  (Tr. 498).  The ALJ asked the VE to consider an individual with Evans's vocational profile who was limited to light work except she could never climb ladders, ropes or scaffolds; she could occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs.  (Tr. 496-497).  The VE testified that this individual would be able to perform Evans's past jobs.  She would also be able to perform the jobs of cashier, stock checker, and order clerk.  (Tr. 498-499).  If the individual was limited to sedentary work, she would still be able to work as a graphic designer.  (Tr. 498).  She would also be able to perform the jobs of document preparer, order clerk for food and beverage, and charge account clerk.  (Tr. 499).  The VE opined that most employers would tolerate employees being off task 9% of the time in addition to scheduled breaks.  She further opined that no employment would be available to an employee who missed work, arrived late to work or left early from work, two or more times a week.  (Tr. 500).

If the individual was further limited to lifting 25 pounds occasionally, 10 pounds frequently; standing and walking no more than four hours out of an eight hour workday; and occasionally reaching, pushing, pulling and gross manipulation, the VE opined that she would not be able to do a full range of light work, but would be able to work as a tanning salon attendant, a laminating machine offbearer and an investigator of dealer accounts.  (Tr. 501).

---

[2] The VE's resume is found at Tr. 647.

## IV.  The ALJ's Decision

The ALJ made the following paraphrased findings relevant to this appeal:

5.  Evans had the residual functional capacity to perform less than a full range of light work.  She could not climb ladders, ropes or scaffolds; she could occasionally balance, stoop, kneel, crouch, crawl and climb stairs; and she must avoid all exposure to hazards, such as dangerous machinery and unprotected heights.  (Tr. 16).

6.  Considering Evans's age, education, work experience and residual functional capacity, she was able to perform her past work as a graphic designer and customer service clerk.  (Tr. 25-26).  Alternatively, there were other jobs in the national economy that Evans would also be able to perform, such as cashier II, stock checker and order clerk.  (Tr. 26-27).

Based on all of his findings, the ALJ determined that Evans was not under a disability from August 2, 2015 through the date of his decision.  (Tr. 27).

## V.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 2020 U.S. App. LEXIS 25007, at *15, ___ F. App'x ___ (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this

standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.

Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a).

### B.  Treating Physician Rule

Evans argues that the ALJ erred by assigning limited weight to the opinions of her treating physicians.  At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives.  20 C.F.R. §§ 404.1527(c).  An ALJ must give a treating source opinion controlling weight, unless the opinion is: (1) not "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with findings in the treating source's own records or other medical evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).  And, if the ALJ finds either prong justifies giving the treating source opinion less-than-controlling weight, he must articulate "good reasons" for doing so – *i.e.*, explain which prong justifies that

16

decision. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ determines that the treating physician's opinion is not due controlling weight, the ALJ must proceed to weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. §§ 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide good reasons for the ultimate weight assigned to the opinion. *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(d)(2) requires the ALJ to articulate good reasons for the ultimate weight given to a medical opinion). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

17

### 1.    Dr. Mars

After summarizing Dr. Mars's functional limitation opinions, the ALJ assigned limited

weight, stating:

> A treating physician's medical opinion on the issue of the nature and severity of
> an impairment is entitled to special significance and, when supported by
> objective medical evidence of record, is entitled to controlling weight (20 CFR
> 404.1527(c)(2)).  On the other hand, statements that the claimant is "disabled",
> "unable to work" cannot perform a past job, determines the residual functional
> capacity or meets a Listing, are not medical opinions, but are administrative
> findings requiring familiarity with the Regulations and legal standards set forth
> within the case.  (20 CFR 404.1527(d)).  Such issues are reserved to the
> Commissioner, who cannot abdicate statutory responsibility to determine the
> ultimate issue of disability.  Indeed, opinions on issues reserved to the
> Commissioner, such as the above opinion, can never be given controlling weight,
> but must be carefully considered to determine the extent to which they are
> supported by the record as a whole or contradicted by persuasive evidence.  (20
> CFR 404.1527(d)(2)).  The undersigned gives no weight to the portion of the
> opinion addressing the ultimate issue of disability, as that issue is reserved to the
> Commissioner.  With respect to the other limitations, the doctor's own treatment
> records and examination findings of record do not support limitations in
> standing, walking, reaching, postural activities, fine and gross manipulation,
> limitations on all environmental factors, the need for unscheduled breaks, or
> impaired attendance or on-task behavior.  For example, at examination on
> October 26, 2016, her neurological exam was normal, including intact cranial
> nerves; normal and symmetrical reflexes; intact and equal strength in the upper
> and lower extremities bilaterally; full sensation; normal coordination; and no
> vertigo with rapid side-to-side movement.  (Ex. 18F/1-2).  The claimant had
> similarly unremarkable examinations with Dr. Mars on February 27, 2017, June
> 26, 2017.  (See Exs. 20F/3-4 and 23 F/2-3).  The claimant's examinations were
> unremarkable for symptoms of signs of headaches.  Interestingly, the doctor's
> examination findings for the period at issue are similar to the doctor's
> examination findings for the period when the claimant was working full-time.
> (See e.g., Ex. 10F/13 and 15).  The relatively severe and extreme limitations the
> doctor found appear to be based primarily on the claimant's reports and not on
> the claimant's medical record, including the doctor's own treatment records.  As
> discussed above, the claimant's reports are not entirely internally consistent and
> they do not reflect that she was taking medication for significant portions of the
> period at issue.  The doctor's reliance on the claimant's inconsistent  reports and
> reported functioning while not treating for her conditions consistently renders the
> examination findings of record, imaging, and weighted medical opinion.  (See
> e.g., exams at Exs. 5F/17-18 and 10F/13; benign imaging at Ex. 10F/11 (cervical
> MRI and Ex. 5F/28-29 (bilateral knee ex-ray); and medical opinion at Ex. 1A/8-
> 10).  The undersigned gives limited weight to the opinion to the extent the

restrictions on lifting and carrying and exposure to heights and machinery are consistent with the above residual functional capacity finding.  Those portions are consistent with the evidence of record, as explained above.  Otherwise, the doctor's opined limitations far exceed those supported by medical evidence of record.  For these reasons, and based on this evidence, the undersigned gives limited weight to the doctor's opinions.

(Tr. 23-24).

The ALJ properly rejected Dr. Mars's opinion addressing the ultimate issue of disability.  That is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(1)-(2).  Regarding Dr. Mars's other opinions, the ALJ was required to assign controlling weight unless they were not "supported by medically acceptable clinical and laboratory diagnostic techniques," or were inconsistent with findings in his own records or other medical evidence.  20 C.F.R. §§ 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).

The ALJ found that Dr. Mars's own treatment records and examination findings of record did not support his opinions on limitations for standing, walking, reaching, postural activities, fine and gross manipulation, limitations on all environmental factors, the need for unscheduled breaks, or impaired attendance or on-task behavior.  The ALJ cited specific records in support of his finding.  He noted that Evans's neurological exam was normal, including intact cranial nerves; normal and symmetrical reflexes; intact and equal strength in the upper and lower extremities bilaterally; full sensation; normal coordination; and no vertigo with rapid side-to-side movement on October 26, 2016, February 27, 2017 and June 26, 2017.  (Tr. 24).  The ALJ also noted that Dr. Mars's examination findings were similar when Evans was working full-time.  (Tr. 24).  Finally, the ALJ noted that many of Dr. Mars's opinions seemed to be based on Evans's subjective reports.  (Tr. 24).

Because he did not assign controlling weight to Dr. Mars's opinions, the ALJ was required to proceed to weigh Dr. Mars's opinion based on: the length and frequency of treatment,

the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6). And he did. The ALJ assigned limited weight to Dr. Mars's opinions because he found that some of them were not supported by the objective evidence in the record or by Dr. Mars's own treatment notes. This was an adequate explanation and the ALJ was not required to explain how he evaluated each of the factors in the regulations. *See* 20 C.F.R. §§ 404.1527(c); *Biestek*, 880 F.3d at 786. I agree with the ALJ's decision here; but even if I didn't, I could not say that he failed to provide good reasons based on substantial evidence to discount Dr. Mars's opinions.

Evans argues that Dr. Mars's treatment notes document that her complaints were consistent over her lengthy treatment history with him. ECF Doc. 13-1 at 18. Unfortunately for Evans, the ALJ did not fully accept her subjective statements regarding pain and functional abilities. And, because he did not fully accept *her* statements, he was not required to accept her physician's opinions to the extent they were based on her subjective reports. "[I]f an ALJ finds . . . subjective reports to be unworthy of complete belief, any medical opinion based on such complaints may also be discounted." *Lunsford v. Astrue*, 2012 U.S. Dist. LEXIS 52792, at *13 (S.D. Ohio Apr. 16, 2012), citing *Allen v. Comm'r of Social Security*. 561 F.3d 646, 652 (6th Cir. 2009)).

I find that the ALJ provided good reasons in accordance with 20 C.F.R. §§ 404.1527(c)(2) for assigning limited weight to Dr. Mars's opinions. The ALJ's evaluation of

Dr. Mars's opinions was within his "zone of choice" and must be affirmed.  *Mullen*, 800 F.2d at 545.

### 2. Dr. Kirsch

Evans acknowledges that she only saw Dr. Kirsch once in this record.  Even so, she expressly argues that his opinion was consistent with that of Dr. Mars and implicitly argues that the ALJ should have assigned controlling weight to it.  ECF Doc. 13-1 at 19.  After summarizing Dr. Kirsch's opinions, the ALJ stated:

> The record contains only one treatment note from the doctor dated December 26, 2017.  (See 32 F/1).  The undersigned questions whether the claimant has established a treating relationship with this doctor.  Nonetheless, the undersigned evaluated the doctor's opinion as one from a treating source.  The criteria for evaluating medical opinions are set forth in 20 CFR 404.1527.  These sections state, among other things, that generally more weight is given to the opinions of treating sources because they are likely to be most able to provide a detailed longitudinal picture of the claimant's impairments.  However, if it is found that a treating source's medical opinion on the issue of the nature and severity of the claimant's impairments is not well supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with other evidence of record, it will not be given controlling weight.

> The undersigned gives limited weight to this opinion because the record supports that the doctor had limited contact with the claimant, the doctor's opined limitations are inconsistent with the doctor's own examination findings, the doctor appears to have adopted the claimant's subjective allegations without objective medical findings and other corroborating signs or symptoms and the opinion is inconsistent with the other medical evidence of record.  For example, at an exam with Dr. Kirsch on December 26, 2017, the claimant reported that she lifts her 2-year-old son frequently, and on exam she was well appearing, in no acute distress, and her neck had no tenderness to palpation.  (Ex. 32F/1).  The claimant presented with disability paperwork for the doctor to complete at the visit that day, and the doctor appears to have memorialized the claimant's complaints as functional limitations.  (See similarity in the claimant's reports at the visit on December 26, 2017 at Ex. 32 F/1, and the doctor's opinion at Ex. 29F).  With respect to the doctor's opined limitations on standing, walking, reaching, postural activities, fine and gross manipulation, limitations on all environmental factors, the need for unscheduled breaks, or impaired attendance or on-task behavior, the doctor's own examination findings do not support such a degree of limitation.  (See Ex. 32 F/2-3).  The claimant's examinations were unremarkable for symptoms or signs of headaches and she had no tenderness to

21

palpation of her neck. The relatively severe and extreme limitations the doctor found appear to be based primarily on the claimant's reports, and not on the claimant's medical record, including the doctor's own treatment records. As discussed above, the claimant's reports are not entirely internally consistent and they do not reflect that she was taking medication for significant portions of the period at issue. The doctor's reliance on the claimant's inconsistent reports and reported functioning while not treating for her condition consistently (taking medication for her migraines), renders the doctor's opinions less persuasive. The doctor's opinion is also inconsistent with the other examination findings of record, imaging, and weighted medical opinion. (See e.g., predominantly unremarkable exams at Exs. 5F/17-18, 10F/13, 18F/1-2, 20F/3-4, and 23F/2-3; benign imaging at Exs. 1A/8-10). The undersigned gives limited weight to the opinion to the extent the restrictions on lifting and carrying and exposure to heights and machinery, are consistent with the above residual functional capacity finding. Those portions are consistent with the evidence of record, as explained above. Otherwise, the doctor's opined limitations far exceed those supported by medical evidence of record. For these reasons, and based on this evidence, the undersigned gives limited weight to the doctor's opinions.

(Tr. 22-23).

Given the ALJ's assumption that Dr. Kirsch was a treating physician, the ALJ properly applied the treating physician rule to Dr. Kirsch's opinions. 20 C.F.R. §§ 404.1527(c)(2). He found that Dr. Kirsch's opinions were not consistent with his own treatment notes and that they appeared to be based on Evans's subjective complaints, which he did not fully accept. Evans only argues that Dr. Kirsch's opinion was consistent with Dr. Mars's opinion and that both of the opinions were consistent with her complaints in the record. As explained below, the ALJ did not fully credit Evans's subjective complaints and he provided adequate reasoning for this assessment. Because he did not fully accept her subjective complaints, he was not required to assign controlling weight to the physicians' opinions based on those subjective reports. Evans has not shown that the ALJ failed to properly apply the treating physician rule to the opinions of Dr. Kirsch and his decision assigning limited weight must be affirmed.

### 3.    Dr. Seleshi

Evans also argues that the ALJ assigned greater weight to the opinion of the state agency consulting physician, Dr. Seleshi, even though much of the evidence was obtained after Dr. Seleshi's review.  ECF Doc. 13-1 at 19.  Evans fails to fully develop this argument because she has not explained how this had any negative impact on the ALJ's decision.  Dr. Seleshi opined that Evans could lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk for up to 6 hours in an 8-hour day; and sit for up to 6 hours in an 8-hour workday.  He further opined that Evans could never climb ladders ropes or scaffolds; could occasionally kneel, crouch and crawl; could frequently stoop; and could not work around unprotected heights or dangerous unshielded machinery.  (Tr. 514-516).

Dr. Mars and Dr. Kirsch opined Evans could lift 25 pounds occasionally and 10 pounds frequently; could stand or walk four hours and two hours without interruption; and that her sitting was unlimited.  (Tr. 1155).  They also opined that Evans could only rarely climb, balance, stoop, crouch, kneel, crawl, reach, push/pull and use fine/gross manipulation.  They opined that Evans's impairments were affected by heights, moving machinery, temperature extremes, pulmonary irritants and noises.  Some of their opinions were more restrictive than those of Dr. Seleshi and some were less restrictive.  Evans has not made any attempt to explain how the ALJ's assignment of significant weight to Dr. Seleshi's opinion contributed to the denial of her application.

Nor has Evans explained how the additional evidence submitted after Dr. Seleshi reviewed her records would have changed his opinions.  She has not cited any evidence submitted after his review in May 2016 that would have altered his residual functional capacity opinions.  Evan's main problem with the ALJ's RFC assessment is that he did not accept her

treating sources' opinions regarding the amount of work she would miss due to her headache pain.  ECF Doc. 13-1 at 20-23.  But these opinions were not based on any actual history of missing work, they were based on Evans's own reports that she would not be able to work when she was having a migraine headache and how frequently she experienced them.  Dr. Seleshi did not render any opinion on the issues of absenteeism or being off task.  (Tr. 514-516).  Evans has not identified any misapplication of legal standards in the ALJ's evaluation of Dr. Seleshi's opinions.

### 4. Subjective Symptoms of Pain

Evans has not expressly argued that the ALJ erred in evaluating her subjective symptoms. However, because the ALJ assigned less than controlling weight to the opinions of her treating physicians, in part, because they relied on her subjective symptoms, I have closely reviewed the ALJ's evaluation of Evans's subjective symptom complaints.

Evans argues that she consistently complained of pain from her migraine headaches and that this supported the treating physicians' opinions.  ECF Doc. 13-1 at 18-19.  Migraine headaches cause pain and "[p]ain is an elusive phenomena.  Ultimately, no one can say with certainty that another person's subjectively disabling pain precludes all substantial gainful employment."  *Bobb v. Astrue*, 2:10cv00422, 2011 U.S. Dist. LEXIS 32830, 2011 WL 1238376, at *11 (S.D. Ohio Feb. 23, 2011).  "Pain is always subjective in the sense of being experienced in the brain."  *Kelly v. Comm'r of Soc. Sec.*, No. 2:10-CV-00775, 2011 U.S. Dist. LEXIS 110197, 2011 WL 4482489, at *2 (S.D. Ohio Sept. 27, 2011).

The ALJ is tasked with evaluating a claimant's subjective symptom complaints.  A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874

F.2d 1116, 1123 (6th Cir. 1989).  An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate her symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, an ALJ's decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F.

App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

Here, the ALJ did not err in his analysis of Evans's subjective symptom complaints regarding pain and functional limitations caused by her migraine headaches.  He provided a detailed explanation, stating:

> After careful consideration, the undersigned finds that the claimant's allegations are not entirely consistent with the evidence of record.
>
> The claimant's reporting has been inconsistent to her medical providers.  The claimant reported that she stopped working and went on maternity leave at a visit on September 18, 2015.  (Ex. 5F/16).  At that visit, the claimant reported no history of headaches.  (Ex. 5F/16).  In a disability report, the claimant represented that she stopped working on August 2, 2015, and that pregnancy made her condition worse.  (See. Ex. 2E/2).  In December of 2014, she reported having headaches for years, extending back into the period she was working full time.  (Ex. 10F/16).  At her examinations prior to the alleged onset date and when she was working full-time, her neurological examinations were unremarkable.  (See e.g., exams on May 16, 2013 (Ex. 10F/13) and August 7, 2014 (Ex. 10F/15).  Those examinations from before the period at issue are substantially similar to the unremarkable examinations of record since the alleged onset date.  For example, at examination on September 18, 2015, her head was unremarkable; her neck was normal; and she had full strength, normal sensation, and normal reflexes throughout.  (Ex. 5F/17-18).  The claimant's other examinations of record were similarly unremarkable.  (See e.g., Exs. 1F/12-13; 18F/1-2; 20F/3-4 and 23F/2-3).  The claimant's examinations were unremarkable for symptoms of signs of headaches.  The record does not contain evidence to support that claimant's headaches compromised her ability to attend work or made her off-task to the extent she was unable to perform her job before the period at issue, and the claimant's physical examinations remained consistently, predominantly, unremarkable through both periods.
>
> The claimant reported headaches at varying frequencies from one to three per week.  (See Exs. 6F/19 and 22F/21).  In August of 2017, she reported that she was not using migraine medication every day, and that she was able to deal with the pain.  (Ex. 32F/1).  On December 5, 2016, she was not taking medications for the headaches because she was breastfeeding.  (See Ex. 22F/21).  The claimant reported not taking her migraine headache medication as far back as January of 2016.  (See Ex. 22F/1).  While the claimant reported debilitating headaches, one would expect the claimant to take medication for her migraines based on the severity of symptoms limitations she has alleged.  The claimant's inconsistent use of medication to treat headaches suggests that they might not be as debilitating as

she has alleged.  Essentially, the claimant's reports regarding her headaches reflect symptoms of an untreated condition for at least a significant portion of the period at issue.  Despite not taking medication consistently to treat her headaches, the record does not contain emergency department visits related to migraine headaches.  One would expect some emergency department visits based on the severity and frequency of headaches the claimant has alleged.  While the claimant reported frequent headaches, her neurological examinations were consistently unremarkable.  (See Exs. 18F/1-2; 20F/3-4; and 23 F/2-3).  In sum, considering the absence of emergency department visits and unremarkable examinations during  the relevant period, despite the claimant not taking medication to treat the condition throughout the relevant period consistently, the claimant's allegations are not entirely consistent with the medical evidence of record.  Also, after reviewing the medical evidence at the initial and reconsideration levels, the state agency medical consultant did not find that the record supported a disabling degree of limitations, including no reference to off-task or absenteeism based on the claimant's migraines or other impairments.  (See Exs. 1A/8-10 and 2A/5-7).

(Tr. 19-20).

In assessing Evans's subjective symptoms complaints, the ALJ expressly discussed most of the factors listed in SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3).  He clearly considered the nature of Evans's symptoms, her efforts to alleviate her symptoms, the type and efficacy of any treatment, and the fact that her symptoms seemed to be similar to the symptoms she had been experiencing when she was working.  He cited specific reasons for his determination and properly evaluated her subjective complaints.

Because the ALJ found that Evans's complaints were not entirely consistent with the evidence of record, he was not required to assign controlling weight to the opinions of her treating physicians which were based, in large part, on her subjective complaints.  Evans has not identified any legal error in the ALJ's application of 20 C.F.R. §§ 404.1527(c) to the opinions of Dr. Mars or Dr. Kirsch.

### C.    RFC Determination

Evans also argues that the ALJ's RFC assessment was not supported by substantial evidence and that he should have incorporated more limitations with respect to her migraine

27

headaches.  ECF Doc. 13-1 at 20-22.  Specifically, she argues that the ALJ should have included limitations in his RFC assessment reflecting her treating physicians' opinions that she would miss work at least once a week and would need to take frequent rest breaks.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[3] SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A plaintiff's residual functional capacity is defined as "the most a claimant can still do despite the physical and mental limitations resulting from her impairments."  *Poe v. Comm'r of Soc. Sec.,* 342 F. App'x 149, 155 (6th Cir. 2009); see also 20 C.F.R. §§404.1545(a).  An ALJ may not determine the residual functional capacity by failing to address portions of the relevant medical record, or by selectively parsing the record – i.e., "cherry-picking" it – to avoid analyzing all the relevant evidence.  *Gentry v. Comm'r of Soc. Sec.,* 741 F.3d 708, 723 (6th Cir. 2014).

An ALJ improperly "cherry-picks" evidence when his decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC

---

[3] Evans's brief asserts that the ALJ erred in "not finding that migraine headaches constituted a severe impairment."  ECF Doc. 13-1 at 21.  But the ALJ *did* find that migraine headaches were one of Evans's severe impairments.  (Tr. 14).

finding, and does not explain why he chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

Here, the ALJ's decision included a thorough summary of the medical evidence including many medical records documenting Evans's migraine headaches. It appears that he considered all of the evidence, and Evans does not identify any specific evidence he failed to consider. The ALJ expressly stated that his residual functional capacity assessment reflected a consideration of Evans's symptoms and the effects of treatment related to her migraine headaches, in addition to her other impairments. (Tr. 21). Thus, it does not appear that the ALJ failed to consider all of the medical evidence related to Evans's headaches when assessing her RFC. Instead, it appears that he did not weigh that evidence in the manner propounded by Evans. But, as already explained, the ALJ did not err in his application of the legal standards to Evans's subjective symptom complaints or in his evaluation of the treating source opinions. The ALJ was not required to incorporate more limitations in Evans's RFC for her migraine headaches. His RFC assessment was supported by substantial evidence and was well within his zone of choice.

### D. Sentence Six – New and Material Evidence

Finally, Evans argues that the court should remand her case pursuant to Sentence Six of 42 U.S.C. § 405(g), because new and material evidence was submitted after the hearing that, if considered, could change the outcome of her case. ECF Doc. 13-1 at 23-25. A court may remand a case for the Commissioner to consider newly discovered evidence pursuant to Sentence

Six of 42 U.S.C. § 405(g).  To obtain such a remand, the claimant must show that: (1) the evidence is new; (2) the evidence is material; and (3) good cause excuses the claimant's failure to incorporate the evidence into a prior administrative proceeding.  42 U.S.C. § 405(g); *Casey v. Sec'y of Health & Hum. Serv.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

"New evidence" is evidence that did not exist or was not available to the claimant at the time of the administrative proceeding.  *Finkelstein v. Sullivan*, 496 U.S. 617, 626 (1990).  The Commissioner correctly argues that some of the "new evidence" submitted by Evans existed prior to the administrative hearing.  ECF Doc. 15 at 12-13.  Some of the "new" dental records related to pain in her temporomandibular joint were created on August 31, 2017 (Tr. 436), prior to Evans's administrative proceeding.

The Commissioner also argues that the other additional evidence was not material.  ECF Doc. 15 at 13.  To be material, the evidence must be: (1) chronologically relevant, *i.e.* reflect upon the claimant's condition during the relevant period; and (2) probative, *i.e.*, have a reasonable probability that it would change the administrative result.  *See Casey*, 987 F.2d at 1233 (holding that a claimant's new evidence was not material because it did not show a "marked departure from previous examinations" and it "pertain[ed] to a time outside the scope of our inquiry"); *accord Winslow v Comm'r of Soc. Sec.*, 556 F. App'x 418, 422 (6th Cir. 2014).

The new records submitted by Evans after the hearing are similar to the records that were reviewed by the ALJ in that they documented pain and were dependent on Evans's subjective reporting regarding the severity and frequency of that pain.  Evans has not explained how this additional evidence would have changed the outcome of her administrative proceedings.  Evans argues that the new evidence is material because it shows that her temporomandibular joint syndrome was a contributing factor to her headaches and that she was receiving treatment for

this condition.  ECF Doc. 13-1 at 25.  However, the ALJ already reviewed records showing that Evans's temporomandibular joint syndrome might be a contributing factor to her headaches and that did not cause him to reach a different conclusion.  (Tr. 1149).  The "new" records, like the ones already reviewed by the ALJ, merely documented treatment based on Evans's subjective symptom complaints.  Because it is unlikely that these records would have changed the outcome of Evans's administrative proceedings, they are not material for purposes of considering a Sentence Six remand.

Because Evans has not satisfied the new or materiality elements, she has not met her burden to show that a Sentence Six remand is appropriate in this case.  *Casey*, 987 F.2d at 1233; 42 U.S.C. § 405(g).  Accordingly, Evans's request to remand this case to the Commissioner for consideration of her new evidence must be denied.

**VI.    Conclusion**

The ALJ properly evaluated the medical opinion evidence, including the opinions of Dr. Mars and Dr. Kirsch.  The ALJ did not err in determining Evans's RFC based on *all* of the record evidence.  And Evans is not entitled to a Sentence Six remand because she has not shown that the additional evidence she submitted was new and/or material.  Because the ALJ's decision was supported by substantial evidence and because Evans has not identified any incorrect application of legal standards, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

Dated: October 14, 2020

Thomas M. Parker
United States Magistrate Judge